**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

| | |
|---|---|
| CINETOPIA LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>AMC ENTERTAINMENT HOLDINGS, )<br>INC. and )<br>AMERICAN MULTI-CINEMA, INC., )<br><br>Defendants. ) | Case No. 18-cv-2222 |

**COMPLAINT AND JURY DEMAND**

Plaintiff, Cinetopia LLC, hereby states for its Complaint against AMC Entertainment

Holdings, Inc. and its subsidiary American Multi-Cinema, Inc. (collectively "AMC") as follows:

**NATURE OF THE ACTION**

1.     This case is about AMC's weaponization of clearances to insulate its older movie

theaters from competition and stifle its rivals' efforts to introduce innovative new theater concepts

to consumers.  AMC has violated federal antitrust law and state law with respect to the market for

exhibition of "first run," feature-length motion pictures[1] ("Movies").

2.     AMC is the largest Movie theater operator in the United States.  In the 1990s, AMC

achieved its dominant position by building megaplexes on top of its competitors, playing the same

Movies at the same times as them, and driving them out of business.  By the 2000s, AMC possessed

an  enormous  circuit  of  aging  theaters  while  new  nimble  competitors,  like  Cinetopia,  were

_____

[1] Motions pictures are also known as "films."

introducing upscale cinematic entertainment destinations that used Movies in synergy with other cultural offerings to increase the audiences of both.

3.      Threatened by these innovative competitors, AMC's former Chief Executive Officer, Gerry Lopez, said that AMC would use the "full weight and power" of AMC to prevent them from building new theaters near AMC Theaters.  AMC adopted a new "National Clearance Position" and informed Movie distributors that AMC wanted "clearances" over any new theater within three miles of an existing AMC theater. ("Clearance" means exclusivity – Movie distributors could not simultaneously license the same Movies to AMC and to nearby competitors.)

4.      AMC adopted this new exclusivity policy to prevent or limit entry of innovative theater concepts and to insulate AMC from competition.

5.      On May 23, 2014, Cinetopia opened a cutting-edge dine-in multiplex in Overland Park, Kansas ("Cinetopia Overland Park 18").  Cinetopia was the anchor tenant of the Prairiefire at Lionsgate development ("Prairiefire Development"), which was created and managed by MC Prairiefire.  The Prairiefire Development is located virtually next door to AMC's headquarters and amidst three AMC megaplexes.

6.      AMC immediately targeted Cinetopia Overland Park 18 with its new clearance policy.  AMC's clearances prevented Cinetopia Overland Park 18 from showing many top Movies, torpedoed its debut as a destination theater, injured its reputation, and caused it to incur substantial operating losses.  AMC's clearances also undermined the debut of the Prairiefire Development, reducing its attendance and revenues and limiting its growth and viability.

7.      In other words, AMC dealt a crippling blow to Cinetopia Overland Park 18 and the Prairiefire Development at the critical moment of their launch.

8.      Such patently anticompetitive conduct is precisely what the antitrust laws were designed to punish and prevent.

9.      AMC has used its national market power, as well as its market power in Overland Park, Kansas, to coerce Movie distributors into denying Cinetopia Overland Park 18 fair, competitive access to Movies. This illegal conduct has restricted output in the relevant market, limited the public's freedom of theater choice, reduced the quality of Movie theaters offered to the public, severely damaged competition in the relevant Movie market, and damaged Cinetopia's business and property.

10.     Cinetopia brings this action to obtain compensatory damages, treble/punitive damages, injunctive relief, litigation costs, reasonable attorneys' fees, and other relief from AMC.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction of this action pursuant to 15 U.S.C. §§ 4 and 15(a) and 28 U.S.C. §§ 1331 and 1337(a).  Cinetopia alleges violations of the Sherman Antitrust Act over which this Court has jurisdiction under 15 U.S.C. §§ 4 and 15 and 28 U.S.C. § 1337(a).  This Court also has federal question jurisdiction over Plaintiffs' federal antitrust claims under 28 U.S.C. § 1331.  The licensing and exhibition of Movies is a commercial activity that substantially affects, and is in the flow of, interstate trade and commerce.  In addition, the parties' activities in purchasing equipment, services, and supplies substantially affect interstate commerce.

12.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's state-law claims.

13.     This Court has personal jurisdiction over Defendants because (1) the corporate headquarters of each Defendant is located in Kansas; (2) Defendants have systematic contacts with Kansas because they have, either directly or through their agents, purposefully availed themselves of the benefits and protections offered by the State of Kansas by conducting business in this State;

and (3) Defendants have committed unlawful acts within Kansas that give rise to the causes of action alleged herein.

14.     Venue is proper in this Court under 28 U.S.C. § 1391(b), as both Defendants reside in Kansas and a substantial part of the events giving rise to the claims occurred in Kansas.

## PARTIES

15.     Cinetopia LLC is a limited liability corporation formed under the laws of the State of Washington and headquartered in Beaverton, Oregon.  Cinetopia LLC owns and operates four Movie theaters: (1) the Cinetopia Overland Park 18 in Overland Park, Kansas; (2) the Cinetopia Progress Ridge 14 in Beaverton, Oregon; (3) the Cinetopia Vancouver Mall 23 in Vancouver, Washington; and (4) the Cinteopia Mill Plain 8 in Vancouver, Washington.

16.     Defendant AMC Entertainment Holdings, Inc. is a Delaware corporation with its headquarters at One AMC Way, 11500 Ash Street, Leawood, Kansas.

17.     Defendant American Multi-Cinema, Inc. is a Missouri corporation with its headquarters at One AMC Way, 11500 Ash Street, Leawood, Kansas.  American Multi-Cinema, Inc. is an operating subsidiary of Defendant AMC Entertainment Holdings, Inc.

18.     AMC is the #1 Movie theater operator in the U.S.  As of December 31, 2017, AMC owned, operated, or held interests in 649 Movie theaters with a total of 8,224 screens in the United States.

## FACTUAL BACKGROUND

## I.     DEFINITIONS AND MOVIE INDUSTRY STRUCTURE

19.     Movies are a unique form of entertainment.  The experience of viewing a Movie in a theater differs from live entertainment (*e.g.*, a stage production), a sporting event, or viewing a Movie at home (*e.g.*, on a DVD or via pay-per-view).

20.     Home viewing is not a reasonable substitute for viewing Movies in a theater. The theater experience for Movies is not easily replicated in the home; theaters offer advanced sound systems, larger screens, and a social experience.  Additionally, most popular, newly released, "first run" Movies are not readily available for home viewing.

21.     Differences in the pricing of various forms of entertainment also reflect their lack of substitutability in the eyes of consumers.  Ticket prices for Movies are generally different from prices for other forms of entertainment.

22.     Tickets for most forms of live entertainment are typically much more expensive than Movie tickets.

23.     Renting a Movie via DVD or pay-per-view is usually much less expensive than viewing a Movie in a theater.  Rental fees are generally lower than ticket prices.  Viewing a Movie in a theater also imposes additional costs on consumers in the form of driving costs (driving time, gasoline, and vehicle depreciation) plus concession costs (in-theater prices for food and drinks are higher than prices for the equivalent food and drinks purchased elsewhere).

24.     Movies come to the public through a three-step process: production, distribution, and exhibition.  These steps involve extensive activities affecting interstate commerce.

25.     *Producers*.  Producers are persons or companies responsible for creating a Movie. A producer gathers the writers, directors, actors, and other talent necessary to create a Movie.  The producer also arranges for financing and either distributes the Movie itself or engages a distributor for that purpose.

26.     *Distributors*.  Distributors are companies that arrange for the marketing, promotion, and licensing of Movies for public exhibition in theaters throughout the United States and the world.

27.    *Exhibitors*.  Exhibitors are persons or companies that operate one or more theaters in which Movies are exhibited or shown to the public.  When an exhibitor operates multiple theaters, its theaters are collectively known as a "circuit."  Many theaters have multiple screens, each of which is located in its own auditorium, thereby allowing more than one Movie to be exhibited in the theater at the same time.  Such theaters are known as multiplexes, megaplexes, or theater complexes.  Multiplexes are often located in malls, retail complexes, or entertainment destinations.  The most important driver of the economic success of an exhibitor is fair competitive access to Movies.

28.    *Movie Licenses*.  Distributors grant exhibitors licenses to show Movies for a specified, unbroken period of time (a "run").  In return, exhibitors pay the distributor a Movie rental fee, usually calculated as a percentage of the gross box office revenues from the sale of tickets to view the Movie.

29.    *First Run*.  First run means the initial period of time when a Movie may be exhibited after its release date.  A Movie's theatrical exhibition life generally is no more than a few weeks.  For this reason, a Movie's first run typically is its only theatrical run, except for a limited number of Movies that are licensed for a second run or "sub run" in certain markets at discounted admission prices.  Most Movies are released in other entertainment formats (*e.g.*, DVD and pay-per-view television) approximately 90–120 days after they are released in theaters.  An exhibitor who cannot obtain license rights to a Movie's first run will likely never have access to the Movie, or will have access to it only after its theatrical exhibition value has been virtually exhausted.

30.    *Day-and-Date*.  Given the short duration of first runs, distributors try to maximize revenues by showing new Movies in as many locations as possible on their opening dates.  This strategy capitalizes on initial consumer demand, which usually substantially declines each week

after a Movie's opening date.  Release date "screen count," the number of screens on which a Movie is exhibited on the date of its release, has become an important measure of a Movie's success from the distributors' perspective.  Distributors pressure exhibitors to increase opening screen count by charging them higher rental prices for a Movie's opening week.  For these reasons, distributors typically license their Movies to exhibitors on a "day-and-date" basis, meaning that other exhibitors can show the Movie at the same time (*i.e.*, on the same day and date).

31.     *Film Zones*.  A "film zone" is a geographic or trade area in a city or other area of significant population.  Some film zones are "non-competitive" because the zone has only one theater, which faces no competition for licensing or exhibiting films. Other film zones are "competitive" because they have multiple theaters operated by more than one exhibitor.

32.     *Clearances*.  A "clearance" is an exclusivity agreement, express or implied, between a distributor and a preferentially-treated exhibitor that applies to a film zone.  When a clearance is in effect, the distributor agrees that it will not license a Movie to play or run "day-and-date" (*i.e.*, simultaneously) with any other theater in a "film zone."

33.     AMC operates a substantial number of theaters across the United States in non-competitive film zones.  In these zones, AMC is a *de facto* monopolist exhibitor.

34.     Dominant exhibitor circuits like AMC derive substantial market power from their ability to provide numerous exhibition locations simultaneously to distributors, including locations in non-competitive film zones where a distributor has no other alternative exhibitor to play a Movie.

35.     *Circuit Deals*.  "Circuit deals" are agreements or understandings, express or implied, whereby dominant exhibitor circuits use their circuit and market power to obtain, among other preferential Movie licensing treatment, clearance agreements that exclude other exhibitors

from playing Movies day-and-date or at all on first run.  Such clearance agreements are not in the independent economic best interest of the distributors, who are coerced or induced to grant such clearances.

36.     Circuit deals have long been illegal under antitrust law as set forth, *inter alia*, by the United States Supreme Court decisions in *United States v. Griffith*, 334 U.S. 100 (1948), and *United States v. Crescent Amusement Co*., 323 U.S. 173 (1944), and violate the antitrust requirement that Movies be licensed on a theater-by-theater, film-by-film basis, as set forth in *United States v. Paramount Pictures, Inc*., 334 U.S. 131 (1948).

## II.     RELEVANT MARKETS

### A.     Relevant Product Market

37.     Cinetopia Overland Park 18 and AMC compete in a relevant product market for the licensing and public exhibition of "first run," feature-length Movies ("Movie Market"). The most important Movie product is the blockbuster.  Blockbusters are the subset of Movies that are (1) the most expensive to make; (2) the most heavily advertised and promoted by producers, distributors, and exhibitors; and (3) the most likely to generate significant box office revenues.  Blockbusters are frequently distributed in special formats (such as Premium Large-Screen Format or "PLF") for projection on special equipment (such as IMAX or GXL screens) to increase blockbuster attendance and to maximize blockbuster revenues.  Blockbusters are particularly important to exhibitors, and many exhibitors depend upon access to blockbusters for their survival.

38.     The Movie Market is a mature market featuring little growth.  Over the past ten years, total U.S. and Canadian theater admissions declined while total box office revenues remained relatively flat.  For these reasons, Movie producers and distributors have been vocal

supports of new upscale theater concepts like Cinetopia that hold potential to grow the Movie Market.

39.     The Movie Market is also concentrated at both the distribution and exhibition levels.  At the distribution level, seven distributors earn over 90% of U.S. box office revenues: (1) Disney; (2) 20th Century Fox; (3) Lionsgate; (4) Paramount; (5) Sony; (6) Universal; and (7) Warner Brothers.  Blockbusters account for a disproportionate share of these box office revenues.

40.     At the exhibition level, three circuits earn over 50% of U.S. box office revenues: (1) AMC, (2) Regal Entertainment Group, and (3) Cinemark USA, Inc.

### B.     Relevant Geographic Market

41.     The relevant geographic market for the exhibition of Movies is local because patrons will travel only so far to see Movies.  Approximately 52% of the U.S. population lives within 10 miles of an AMC theater.  Cinetopia Overland Park 18 performed a survey of weekend patrons in 2014, which determined that 2,869 of the 2,934 respondents (98%) came from within a 10-mile radius.

42.     The relevant geographic area of the Movie Market is the area within a 10-mile radius of Cinetopia Overland Park 18 ("Overland Park Movie Market").

### III.     COMPETITORS AND THEIR OFFERINGS IN THE OVERLAND PARK MOVIE MARKET

### A.     Cinetopia

43.     The Cinetopia Overland Park 18 theater complex is located in the Prairiefire Development at 5724 West 136th Terrace in Overland Park, Kansas.  The Prairiefire Development is located near AMC's corporate headquarters and amidst three AMC multiplexes.  MC Prairiefire recruited Cinetopia to be its largest tenant.  Cinetopia receives twice as many clicks as any other attraction on the Prairiefire Development internet homepage.

44.     Cinetopia Overland Park 18 is a unique, cutting-edge Movie venue in numerous respects. It operates a restaurant, Vinotopia, on the premises.  Vinotopia features multiple dining experiences, including a sports bar with 11 LED screens, an upscale dining room, an outdoor dining area, an outdoor lounge, and a wine-tasting cellar room available for unique events like wine classes and wine-maker dinners. Vinotopia also offers a private dining room available by reservation.  Vinotopia offers haute cuisine, along with a full bar service including mixed drinks, 27 beer offerings, and 50 wines.

45.     A majority of Cinetopia Overland Park 18's seats are located in three theaters designed for the exhibition of blockbusters.  These theaters contain giant-screen GXL theaters with Dolby ATMOS 128 channel 360 degree sound, 4K projection, extra-wide rows and ultra-steep VIP coliseum seating.  GXL theaters, like IMAX theaters, are designed to show PLF Movies. Cinetopia's GXL screens are up to twice as large as commercial IMAX screens.  Cinetopia also offers an extensive restaurant and bar menu in its GXL theaters.

46.     Although PLFs comprise less than 20% of the total Movie releases in a given year, Cinetopia has historically earned approximately 65% of its annual box office revenue from PLF titles.

47.     Cinetopia Overland Park 18 also offers 10 Living Room Theaters, featuring a proprietary tiered privacy box seating design, with full electric recliners, 6-8 wall-mounted LED panels creating an immersive Movie experience, and full restaurant and bar service.  Living Room Theaters can be rented out for themed Movie parties, interactive high-definition gaming parties, business presentations, birthdays, and other special events.

48.     Cinetopia Overland Park 18 also offers a proprietary Movie Parlor with a 30-foot Movie screen, 20 additional immersive LED screens, and custom cuddle couches.  Full premium

concessions, including the restaurant and bar menu, are delivered to patron's seats. The Movie Parlor can be rented out for themed Movie parties, interactive high-definition gaming parties, live high-definition sports events, business presentations, birthdays, and other special events.

49.     Virtually all of Cinetopia Overland Park 18's theaters offer reserved seating. Each auditorium is equipped with plush Ultra Leather extra wide seats, extra leg room, and stadium viewing. Many of the theaters have restaurant service, private viewing space, and other luxury accommodations. Cinetopia offers Movie-goers the opportunity to consume alcoholic beverages before and during screenings.

50.     Cinetopia has found that a significant number of its patrons are not regular Movie-goers and would likely not have purchased a Movie ticket but for Cinetopia's unique amenities. Cinetopia thus grows the Movie-going market.

**B.     AMC**

51.     AMC operates three megaplexes with a total of 62 screens within 10 miles of Cinetopia Overland Park 18. AMC operates the AMC Town Center 20 at 11701 Nall Avenue in Leawood, Kansas, approximately 2.7 miles from Cinetopia Overland Park 18. AMC operates the Studio 28 at 12075 South Strang Line Road in Olathe, Kansas approximately 8.6 miles from Cinetopia Overland Park 18. AMC operates the Ward Parkway 14 at 8600 Ward Parkway in Kansas City, Missouri, approximately 8.9 miles from Cinetopia Overland Park 18.

52.     AMC's nearby theaters purport to offer one or more of the following amenities: recliner seating, reserved seating, dine-in service, bar service, 3D, Dolby sound, and IMAX screens. But AMC's amenities are materially different from Cinetopia's amenities, in part because AMC's amenities are neither as innovative nor as luxurious as Cinetopia's amenities.

53.     AMC's Town Center 20 multiplex, the closest AMC theater to Cinetopia Overland Park 18, does not offer a restaurant or upscale dining menu or in-theater waiter and staff service. Consumers have posted the following online reviews of AMC Town Center 20:

> September 8, 2017 – As soon as I walked in the front door, there was trash littered by the box office.  Then the bathroom had some . . .  issues.  I won't go into specifics, but it was gross.  And then in the theater there was a half eaten bag of popcorn in my seat.  The people next to me said it wasn't theirs.  I looked around and notice LOTS of popcorn and bags scattered around, empty cups in cup holders, candy boxes, etc.  Clearly they hadn't cleaned the theater after the last screening. . . .

> August 15, 2017 -- . . . I really like the updated theater and appreciate being able to buy tickets through the app, select seats, and avoid the ticket purchase line, but was disappointed the popcorn machine and seat foot rest were both broken.  I would expect the theater to be better maintained.

> April 1, 2017 – They never pick up the phone and I need to talk to an employee about an issue from when I saw a Movie there.  The experience was fine by their customer service blows.

> January 25, 2017 -- . . . This location is in a very "ritzy" shopping area – Town Center – and is one of our newer theaters.  Because of this we were expecting a very clean theater, everything working as it should, no issues.  Sadly this was not the case.

> . . . [T]he only seats that were available for this Movie were front row.  That's ok though because the seats recline all the way back.  Oh, wait, unless they are BROKEN.  Yup, both of our seats weren't working.  Seats A7 and A 8 in theater 15 in case you're curious.

> . . . Overall I'm very disappointed in both the theater and AMC in general.

> August 11, 2016 . . . Popcorn isn't scooped to order, it is more buffet style so it was cold.  Movie went out today for almost 10 minutes.  Obviously everything is overpriced as well.

> January 9, 2016 . . . I'm glad the tickets were free.  That'd be the only way I'd ever go back and it'd still be a pretty tough decision.

**C.     Regional Theaters**

54.     Three other theaters operate a total of 24 screens within 10 miles of Cinetopia Overland Park 18.

### 1.   B&B Theatres

55.     A regional theater chain, B&B Theatres, operates the Overland Park 16 at 8601 West 135th Street in Overland Park, Kansas, approximately 2.2 miles from Cinetopia Overland Park 18.  The only amenities that B&B offers are stadium seating and 3D.

### 2.   Glenwood Arts – Leawood Theatre

56.     The Glenwood Arts - Leawood Theatre operates six screens at 3707 West 95th Street in Overland Park, Kansas, approximately 6.5 miles from Cinetopia Overland Park 18.  The Leawood Theatre does not offer any of the above-listed amenities.

### 3.   Standees Theatre

57.     The Standees Theatre operates three screens at 3935 West 69th Terrace in Prairie Village, Kansas, approximately 9.0 miles from Cinetopia Overland Park 18.  The Standees Theatre offers an upscale restaurant and bar and in-theater amenities.

## IV.   AMC POSSESSES MARKET POWER IN THE OVERLAND PARK MOVIE MARKET

58.     AMC exerts market power over the Overland Park Movie Market in two ways.

59.     First, AMC offers distributors the largest circuit for the exhibition of Movies in the U.S.  AMC boasts publicly about its "#1 or #2 position by market share" in 10 major cities.  AMC claims that, "[a]s of December 31, 2015, approximately 94% of our screens in the United States were located in Movie licensing zones where we are the sole exhibitor."  Internal AMC documents identify 200 AMC theaters with no competitors within three miles – the criterion AMC uses to determine whether a rival's prospective theater will compete with it.

60.     Second, AMC operates 62 of the 104 screens (60%) operating within a 10-mile radius of Cinetopia Overland Park 18, and, according to Rentrak data, these theaters generate approximately 70% of the box office revenues within that area.

61.     AMC's market power is further evidenced by its ability to force distributors to exclude Cinetopia from the market, as detailed below, and the high barriers to entry into the market.

## V.      AMC'S ANTICOMPETITIVE CONDUCT AND ITS EFFECTS

62.     Prior to approximately 2009, AMC generally did not demand clearances over nearby competing theaters throughout the United States.  Instead, it competed on the merits.

### A.      AMC's Campaign To Exclude Competitors

63.     In 2009, AMC underwent a significant management restructuring.   Gerardo ("Gerry") Lopez was appointed the new President and CEO and elected to AMC's board of directors.

64.     As a result of the restructuring, AMC began a national exclusionary campaign to prevent or limit competitive entry.  AMC used its dominant circuit position and its monopoly power in a substantial number of film zones to prevent or deter distributors and landlords from dealing with AMC's competitors.  This strategy was built upon the assertion of clearances, or exclusive dealing provisions, in Movie licenses.

65.     Around 2010, AMC developed a "National Clearance Position."  AMC eventually articulated this new clearance policy as follows:

> AMC asks distributors to grant clearances (i.e. allocate film) in situations where competitors open/re-open in close proximity . . .
>
> •       Within 3 driving miles of existing AMC location across the U.S.
> •       Within 1.5 driving miles of existing AMC location where over 250,000 people live within 3 miles of AMC location (densely populated)
> •       Within 1 mile of existing AMC location in Manhattan (most densely populated).

66.     AMC discussed this policy with each distributor.  AMC insisted on clearances to protect any theater in its national circuit from "competitive encroachment."  AMC advised the

distributors that it "had considered this position carefully" and would "stand behind it for the long-term health of our shared business."

67.     AMC also discussed this policy with developers and landlords who were considering potential theater developments near AMC theaters.  AMC emphasized that clearances would significantly impair the box office revenues of these new theater developments.

68.     Internally, AMC circulated "competitive encroachment film clearance" reports and held "competitive encroachment meetings," in which it would monitor new potential developments, decide whether to exact clearances, and then monitor the outcomes.

69.     AMC enforced its exclusionary policy by concrete actions.

70.     In early 2010, AMC used its clearance policy to "bleed . . . dry" a Studio Movie Grill dine-in theater in Kansas City, Missouri six months after it had opened, costing Studio Movie Grill $6.5 million.  Studio Movie Grill closed, leaving AMC's Barrywoods 24 theater as the sole theater in the zone.

71.     Shortly thereafter, AMC successfully asserted its clearance policy against a new Cobb Theatre "CinéBistro" venue in Atlanta, Georgia.  AMC's then-CEO, Gerry Lopez, told Cobb Theatres that AMC would use the "full weight and power" of AMC to prevent them from building new theaters near AMC Theaters.

72.     Rich Boynton, then Senior Vice President and Head Film Buyer for the AMC Phipps Plaza 14 and the AMC Fork & Screen Buckhead, sent a letter to the major film distributors in which he stated:

> [The Brookhaven CinéBistro] is 1.9 miles northeast of our AMC PHIPPS 14 and 2.5 miles northeast of our AMC FORK & SCREEN BUCKHEAD 6, and thus we will not play day-and-date with a venue at this location.  . . . We have played 100% of your wide commercial releases and look forward to continuing that arrangement going forward.

73.     This letter operated as a *de facto* demand by AMC for preferential or exclusive Movie licensing treatment over the Brookhaven CinéBistro—a demand that distributors (1) refuse to license certain Movies to the Brookhaven CinéBistro or else risk being denied the grossing potential of AMC's Buckhead theaters and, implicitly, some or all of the theaters in its entire circuit, and that they (2) allow AMC to play Movies at its two Buckhead theaters day-and-date but refuse to license the Brookhaven CinéBistro for day-and-date play with those same theaters.

**B.     AMC Targeted Cinetopia Overland Park 18**

74.     In 2013, AMC learned that MC Prairiefire had recruited Cinetopia to be an anchor tenant at the Prairiefire Development and that construction of the Cinetopia Overland Park 18's facilities was underway.   AMC contacted Cinetopia, claimed to be interested in buying the Cinetopia Overland Park 18 facility, and suggested some very attractive prices.   Cinetopia met with AMC in good faith, allowed AMC to tour its Overland Park facilities, and shared information with AMC in furtherance of the purported deal.   AMC used some of this information to improve its own theaters.   In the end, however, AMC told Cinetopia that it should simply transfer ownership of Cinetopia Overland Park 18's facilities for free.

75.     When Cinetopia declined this "offer," AMC responded: "Okay, then I guess we will see what happens next summer when you try to open."

76.     AMC's "offer" demonstrates that it had both the intent and the capability of throttling Cinetopia in the Overland Park Movie Market.   Theater margins are thin, and operating costs are relatively predictable.   AMC therefore knew that it did not need to cut off Cinetopia's access to every Movie in order to torpedo Cinetopia's entry.   AMC could accomplish the same thing merely by denying Cinetopia's access to a certain number of critical Movies.

77.     Starting in May 2014, AMC successfully implemented clearances against Cinetopia Overland Park 18, purportedly based upon its proximity to AMC's Town Center 20 theater.

78.     Cinetopia Overland Park 18 opened on May 22, 2014.  AMC's clearances denied Cinetopia access to the blockbuster *Godzilla*, so Cinetopia opened with the only other available blockbuster, *X-Men: Days of Future Past*.

79.     In addition to blocking Cinteopia's access to *Godzilla*, AMC further undermined Cinetopia's Prairiefire debut by blocking Cinetopia's access to all of the other Movies that were already playing at AMC Town Center 20.  Because AMC Town Center 20 was already playing virtually all of the desirable Movies that were available at the time, Cinetopia Overland Park 18 was unable to obtain enough desirable Movies to utilize all, or even most, of its screens.  When Cinetopia Overland Park 18 opened, it was only able to obtain access to four different Movies for its 17 screens.  Meanwhile, AMC blocked Cinetopia Overland Park 18's access to 12 other Movies that it wanted.

80.     These patterns continued through 2014 and in subsequent years.

81.     AMC continued to assert clearances that blocked Cinetopia Overland Park 18's access to numerous blockbusters.  For example, in 2014, Cinetopia Overland Park 18 was denied access to such Movies as Disney's *Captain America: Winter Soldier*, *Guardians of the Galaxy*, *Million Dollar Arm*, and *Big Hero 6*; Paramount's *Teenage Mutant Ninja Turtles* and *Interstellar*; Sony's *The Amazing Spider-Man 2* and *The Equalizer*; Universal's *Neighbors* and *Lucy*; and Warner Brothers' *Godzilla, Edge of Tomorrow,* and *Hobbit: The Battle of the Five Armies*.

82.     In 2015, for example, Cinetopia Overland Park 18 was denied access to such blockbusters as Disney's *Avengers: Age of Ultron*, *Ant-Man*, and *The Good Dinosaur*; Lionsgate's *The Hunger Games: Mockingjay Part 2,* and *Divergent Series: The Insurgent*; Paramount's

17

*Mission: Impossible Rogue Nation*, *SpongeBob Movie: The Sponge Out of Water*, *Terminator: Genisys*, and *Daddy's Home*; Sony's *Spectre: 007* and *Hotel Transylvania 2*; and Universal's *Jurassic World*, *Furious 7*, *Minions*, *Everest*, and *Pitch Perfect 2*.

83.     AMC also continued to block Cinetopia Overland Park 18's access to sufficient numbers of desirable Movies to utilize all of its screens.  The first time that Cinetopia Overland Park 18 was able to exhibit at least 14 different Movies on its 17 screens was the week of September 5, 2014.  Even then, most of these were second-rate Movies whose box office performances compared unfavorably to seven other Movies that Cinetopia could not acquire due to AMC's clearances.

84.     As of December 30, 2016, Cinetopia was still blocked from access to popular Movies like *La La Land*, *Lion*, and *Manchester by the Sea*, even though Cinetopia could not obtain enough desirable Movies to fill all of its 17 screens.

85.     If AMC had not demanded preferential treatment, distributors would not have enforced clearances against Cinetopia Overland Park 18.  Indeed, playing Movies day-and-date with competitors is common in the industry, including among exhibitors that are located three miles apart, or less.  AMC itself plays day-and-date with competitors located three miles away, or less.  Distributors routinely grant licenses to AMC to play day-and-date with its own theaters (including the AMC Town Center 20, AMC Studio 28, and AMC Ward Parkway 14 in Kansas) and theaters of other dominant exhibitors.  It would be in the independent best economic interest of the distributors to license Movies to Cinetopia Overland Park 18 on a day-and-date basis with AMC's nearby theaters.

86.     AMC's exclusionary demands, backed by AMC's circuit and monopoly power, were the reason distributors denied Cinetopia fair competitive access to Movies.  These denials

were not based on the distributors' assessment of the quality and customer-drawing capacity of Cinetopia Overland Park 18.

87.     But for AMC's use of its market power to coerce distributors into granting these clearances, the clearances would have been economically irrational for each distributor.

88.     Cinetopia offered distributors several advantages compared to AMC or other competitors.  First, Cinetopia offered a differentiated product that appealed to a segment of upscale Moviegoers who were unlikely to use AMC. Cinetopia thus offered the prospect of expanding the Movie-going public to include customers that AMC could not reach.

89.     Second, to the extent Cinetopia competed with AMC for the same customers, Cinetopia offered better amenities and Movie-going experiences per consumer dollar spent than AMC.  Cinetopia also charged premium pricing that yielded higher average revenues per seat than AMC for certain Movies.

90.     The clearances injured consumers.  The clearances reduced output in the Overland Park Movie Market by reducing the total number of screens and viewings.  The clearances also deprived consumers of the opportunity of seeing certain Movies with the unique and higher quality amenities of Cinetopia Overland Park 18.  Therefore, consumers were made worse off each time AMC asserted clearances against Cinetopia Overland Park 18.

91.     The clearances also injured Cinetopia.  In order to survive, an exhibitor needs fair competitive access to a sufficient number of Movies to maximize its revenues and to utilize all of its screens.  This is especially true of cutting-edge multiplexes featuring extra-large theaters devoted to blockbusters, like Cinetopia Overland Park 18, because these types of theaters rely particularly heavily on blockbuster box office revenues.  AMC's clearances denied Cinetopia

Overland Park 18 fair and competitive access to critical Movies and caused Cinetopia Overland Park 18 to suffer substantial and ongoing operating losses.

92.     There is no efficiency or procompetitive justification for AMC's clearances.  The sole purpose of the clearances was to reduce or eliminate competition and preserve or increase AMC's monopolistic share of the Overland Park Movie Market.

93.     Clearances were once justified on the ground that exclusive licenses would induce exhibitors to invest in substantial extra promotion or advertising.  Today, however, promotional costs are borne almost exclusively by distributors, and exhibitors rarely engage in substantial promotional expenditures.  Before a Movie is released, distributors conduct extensive research, audience tracking, and sophisticated modeling to estimate its likely range of revenues in order to, among other things, determine promotional and advertising budgets.  Distributors have well-informed expectations about likely revenues, well before a Movie is licensed to exhibitors.  AMC's clearances did not induce AMC to invest in any extra promotion or advertising of Movies.

94.     AMC's conduct caused Cinetopia to lose millions of dollars in lost profits.  Cinetopia's losses disrupted and impaired its ability to offer unique Movie experiences because the clearances prevented Cinetopia Overland Park 18 from earning enough to sustain its higher quality amenities.  AMC's clearances made it extremely costly, inefficient, and virtually impossible to operate a multiplex that was specially designed to feature all of the different types of first-run Movies and to maximize revenues of blockbusters.  The clearances thus created a downward spiral from which Cinetopia has yet to recover.  The losses substantially exceeded the profits that Cinetopia earned on its operations in the Portland, Oregon area.  As a result, Cinetopia was forced to drop plans to open new theaters in several new markets and to delay capital

expenditures on theater improvements that were necessary to maintain Cinetopia's market position.

### C. AMC Strung Along Cinetopia for the Purpose of Increasing Its Damages and Forestalling This Lawsuit

95. When AMC started using clearances to drive Cinetopia out of business in May 2014, AMC was the second largest Movie exhibitor in the United States. But it was pursuing an acquisition of another large national theater circuit, Carmike Cinemas. Due to the size the Carmike deal, AMC knew that it would be required to report the deal to the U.S. Department of Justice ("DOJ") and that the DOJ would be concerned about the potential anticompetitive effects of the deal.

96. In order to forestall legal action by Cinetopia to block AMC's unlawful clearances and to prevent the DOJ from learning about this exclusionary conduct, AMC once again pretended to be interested in buying Cinetopia's facilities at attractive prices.

97. AMC announced its acquisition of Carmike Cinemas in December 2016. As a result of the acquisition, AMC became the largest Movie exhibitor in the U.S. However, AMC continued its charade of pretending to be interested in paying fair value for Cinetopia Overland Park 18 while the DOJ reviewed the deal for anticompetitive effects.

98. In February 2016, AMC delivered an indication of interest including a proposed purchase price, but AMC advised Cinetopia that the proposed deal would be delayed due to the DOJ's investigation of the AMC-Carmike deal.

99. AMC repeatedly assured Cinetopia in numerous private communications that it would buy Cinteopia's theaters at the original valuation, after the Carmike deal was finalized.

100. In March 2017, the DOJ approved the Carmike acquisition, subject to certain divestiture conditions.

101.    On May 9, 2017, AMC provided a letter of intent for its proposed acquisition of the Cinetopia theatres.  The purchase price was substantially lower than it had previously offered.

102.    Shortly thereafter, AMC further reduced its offer, claiming that, due to its falling stock price, AMC could no longer complete the deal because its board had imposed moratorium on transactions valued at over $5 million that might last for up to two years.  Cinetopia responded constructively by offering an option to buy Cinetopia within 12 months.  AMC countered with materially worse terms and a new condition: that Cinetopia release all of its legal claims against AMC as a condition of completing the deal.

103.    AMC thus revealed its true predatory intention.  AMC engaged in these bad-faith negotiations while continuing to assert clearances against Cinetopia Overland Park 18 in order to inflict further injury on Cinetopia while simultaneously forestalling Cinetopia's assertion of any antitrust claims that might have jeopardized DOJ approval of the Carmike deal.  In short, AMC sought to eliminate a vigorous new competitor in AMC's own backyard while avoiding federal antitrust scrutiny.

## VI.    IRREPARABLE INJURY

104.    AMC's misconduct toward Cinetopia has suppressed, and continues to suppress, Cinetopia's value and jeopardizes its viability.  Cinetopia will suffer irreparable injury and loss of its business and property, for which there is no adequate remedy at law, unless the Court permanently enjoins AMC from its anticompetitive and tortious conduct.

105.    To the extent that AMC has stopped asserting clearances against Cinetopia Overland Park 18 as to any distributor, AMC is capable of renewing its assertion of clearances at any time.

106.    Cinetopia is thus entitled to injunctive relief against AMC.

# COUNT I

## Circuit Dealing: Violation of Sherman Act § 1 and/or § 2

107.    Plaintiff re-alleges the allegations contained in paragraphs 1 through 106 above.

108.    As the largest theater circuit in the United States, AMC possesses substantial circuit power.

109.    AMC undertook its anticompetitive conduct with the predatory intent to deprive Cinetopia of an opportunity to obtain the supply of Movies needed for effective competition.  This conduct constitutes unlawful circuit dealing in violation of Sections 1 and/or 2 of the Sherman Act, 15 U.S.C. §§ 1 and/or 2, and the long-established rule under antitrust case law that Movies be licensed on a film-by-film, theater-by-theater basis without the discriminatory preferences in favor of one or more dominant theater circuits.

110.    Like the formula deals and master agreements declared unlawful in *Paramount*, AMC's policy and practice of using and threatening to use its circuit power to enforce clearances against competing theaters, including Cinetopia Overland Park 18, "eliminate the opportunity for the small competitor to obtain the choice first runs, and put a premium on the size of the circuit" and "are, therefore, devices for stifling competition and diverting the cream of the business to the large operators."  334 U.S. at 154.  Like the formula deals and master agreements declared unlawful in *Paramount*, AMC's clearance practices also constitute "a misuse of monopoly power insofar as [they] combine[] the theatres in closed towns with competitive situations."  *Id*. at 154–55.

111.    As a direct and proximate result of the unlawful conduct of AMC in furtherance of the violations alleged, Cinetopia has been injured in its business and property in an amount to be proven at trial and automatically trebled, as provided by 15 U.S.C. § 15.

## COUNT II

### Monopolization: Violation of Sherman Act § 2

112.   Plaintiff re-alleges the allegations contained in paragraphs 1 through 106 above.

113.   AMC possesses monopoly power in the Overland Park Movie Market due to its national circuit power, its high share, and the high barriers to entry.

114.   AMC has used its monopoly power to coerce distributors into denying Cinetopia Overland Park 18 the opportunity to compete fairly with AMC for Movie licenses and theater customers, thereby having a direct adverse effect on competition by preventing Cinetopia Overland Park 18 from competing with AMC on the merits.

115.   AMC has insulated itself from competition with Cinetopia for Movie licenses and theater customers and thereby restrained trade in, and willfully maintained or expanded its monopoly power in, the Overland Park Movie Market.

116.   AMC injured competition and consumers.

117.   AMC's conduct has no efficiency or procompetitive benefit or justification.  The anticompetitive effects of its behavior outweigh any purported procompetitive justifications.

118.   AMC has engaged in a course of conduct that amounts to monopolization and/or unlawful exercise of monopoly power in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

119.   As a direct and proximate result of the unlawful conduct of AMC in furtherance of the violations alleged, Cinetopia has been injured in its business and property in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

## COUNT III

### Attempted Monopolization: Violation of Sherman Act § 2

120.   Plaintiff re-alleges the allegations contained in paragraphs 1 through 106 above.

121.     AMC asserted clearances against Cinetopia Overland Park 18 with the specific intent to acquire, maintain, and/or expand its monopoly power in the Overland Park Movie Market.

122.     As evidenced by AMC's high market share and dominant circuit power, there was a dangerously high probability that AMC's scheme to exclude Cinetopia Overland Park 18 and monopolize the Overland Park Movie Market would succeed.

123.     AMC's conduct constitutes attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

124.     As a direct and proximate result of AMC's unlawful conduct, Cinetopia has been injured in its business and property by being foreclosed from fair competitive access to markets for Movie licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

## COUNT IV

### Agreements in Restraint of Trade: Violation of Sherman Act § 1

125.     Plaintiff re-alleges the allegations contained in paragraphs 1 through 106 above.

126.     AMC's assertion of clearances against Cinetopia Overland Park 18, and distributors' acceptance of those clearances, constituted unreasonable agreements in restraint of trade.

127.     AMC induced these agreements by abusing its market power in the Overland Park Movie Market and its dominant national circuit power.

128.     AMC injured competition and consumers.

129.     AMC's conduct has no efficiency or procompetitive benefit or justification.  The anticompetitive effects of these agreements outweigh any purported procompetitive justifications.

130.     AMC's agreements with distributors are unlawful agreements in restraint of trade, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

131.    As a direct and proximate result of the unlawful conduct of AMC in furtherance of the violations alleged, Cinetopia has been injured in its business and property by being foreclosed from fair competitive access to markets for Movie licenses and exhibition in an amount to be proven at trial and to be automatically trebled, as provided by 15 U.S.C. § 15.

## COUNT V

### Tortious Interference with Actual and/or Prospective Business Relations

132.    Plaintiff re-alleges the allegations contained in paragraphs 1 through 106 above.

133.    Cinetopia enjoyed and continues to enjoy relationships with patrons of its theaters that include future economic benefits to Cinetopia from continuing patronage to view a wide variety of Movies.  At all relevant times herein, AMC had actual knowledge of these expected future economic benefits to Cinetopia and knew that this expectancy constituted a valuable business asset and form of revenue for Cinetopia.

134.    Cinetopia enjoyed and continues to enjoy relationships with distributors that include future economic benefits to Cinetopia from the continued fair competitive access to the licensing of Movies.  At all relevant times herein, AMC had actual knowledge of these expected future economic benefits to Cinetopia and knew that this expectancy constituted a valuable business asset and form of revenue for Cinetopia.

135.    Cinetopia and the Prairiefire Development enjoyed and continue to enjoy a relationship that includes future economic benefits related to the operation of a Movie theater at the Prairiefire Development.  At all relevant times herein, AMC had actual knowledge of these expected future economic benefits to Cinetopia and the Prairiefire Development and knew that this expectancy constituted a valuable business asset.

136.    AMC acted intentionally, improperly, and without privilege or justification in its tortious interference with Cinetopia's business relationships with patrons and Movie distributors, and the Prairiefire Development.

137.    AMC's tortious interference with these business relationships include AMC's targeting of Cinetopia for exclusion from markets for Movie licenses, Movie exhibition, and theater space.

138.    AMC acted purposely and with malice and specific intent to injure Cinetopia. AMC disrupted and interfered with, and continues to disrupt and interfere with, the aforementioned economic relationships.

139.    As a direct and proximate result of AMC's wrongful actions, Cinetopia has been injured and continues to suffer financial injury.

140.    As a direct and proximate result of AMC's wrongful conduct, Cinetopia has lost profits they would have otherwise earned but for AMC's conduct.

141.    In doing the things alleged herein, AMC has acted willfully, maliciously, oppressively, with full knowledge of the adverse effects of its actions on Cinetopia, with willful and deliberate disregard of the consequences to Cinetopia, and with specific intent.  As such, Cinetopia seeks exemplary and punitive damages in an amount to be proven at trial.

## COUNT VI

### Estoppel

142.    Cinetopia re-alleges the allegations contained in paragraphs 1 through 106 above.

143.    When AMC promised to purchase Cinetopia Overland Park 18 for fair consideration, Cinetopia reasonably and detrimentally relied upon the promise by making certain expenditures that it otherwise would not have made and by incurring additional substantial operating losses that it would not have incurred.

144.    AMC made the promise with the intent to deceive Cinetopia and to forestall Cinetopia from protecting its legal rights until after the DOJ approved AMC's acquisition of Carmike Cinemas.

145.    AMC's breach of this promise has resulted in substantial injustice to Cinetopia.

## PRAYER FOR RELIEF

WHEREFORE, Cinetopia prays for judgment as follows:

1.      Determine that AMC violated and continues to violate Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2;

2.      Determine that AMC committed and continues to commit the tort of interference with business relations willfully, with malice, fraud, wantonness, oppression, or entire want of care, with specific intent to cause harm to Cinetopia, and in bad faith;

3.      Determine that AMC is barred by the doctrines of promissory estoppel and/or equitable estoppel from reneging on its promise to purchase Cinetopia Overland Park 18 for fair consideration;

4.      Enter judgment for Cinetopia against AMC for damages, including three times the amount of damages sustained by Cinetopia on its antitrust claim, compensatory, exemplary, and punitive damages on Cinetopia's tortious interference claim, compensatory and consequential damages on Cinetopi's estoppel claim, together with Cinetopia's expenses of litigation and cost of this action, including a reasonable attorney's fee, and such other relief as appropriate.

5.      Enjoin AMC from engaging in further anticompetitive and unlawful conduct, including requesting clearances over Cinetopia Overland Park 18.

6.      Grant such other equitable relief, including disgorgement of all unlawfully obtained profits, that the Court deems just and proper.

## DEMAND FOR JURY TRIAL

Cinetopia hereby demands a trial by jury in Kansas City, Kansas, pursuant to Federal Rule of Civil Procedure 38 and Local Rule 40.2.

Dated:  May 4, 2018                                    Respectfully submitted,

**BERKOWITZ OLIVER LLP**

By:____*/s/ David F. Oliver*_____
    David F. Oliver (KS Bar #70731)
    Christina M. Wahl (KS Bar #23406)
    Carson M. Hinderks (KS Bar #25079)
    2600 Grand Blvd., Suite 1200
    Kansas City, Missouri 64108
    Telephone:   (816) 561-7007
    Facsimile:    (816) 561-1888
    doliver@berkowitzoliver.com
    cwahl@berkowitzoliver.com
    chinderks@berkowitzoliver.com

    Michael A. Lindsay (MN Bar #0163466)
    (*Pro Hac Vice pending*)
    lindsay.michael@dorsey.com
    F. Matthew Ralph (MN Bar #0323202)
    (*Pro Hac Vice pending*)
    ralph.matthew@dorsey.com
    *Pro Hac Vice Motions to be Filed*
    **DORSEY & WHITNEY LLP**
    50 South Sixth Street, Suite 1500
    Minneapolis, Minnesota 55402-1498
    Telephone:  (612) 340-2600

**ATTORNEYS FOR PLAINTIFF**