# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

CINETOPIA, LLC,           )
                          )
        Plaintiff,      )
                          )
v.                        )
                          )    Case No. 18-2222-CM-KGG
AMC ENTERTAINMENT HOLDINGS, )
INC. and AMERICAN MULTI-CINEMA, )
INC.,                     )
        Defendants.     )
                          )

## MEMORANDUM AND ORDER

This case involves movie theaters, the films they show, and when the theaters are able to get access to those films. Plaintiff Cinetopia, LLC operates a movie theater in Overland Park, Kansas, in the Prairiefire development. Roughly three miles away, defendants AMC Entertainment Holding, Inc. and American Multi-Cinema, Inc. (collectively, "AMC") operate an AMC theater called the AMC Town Center 20. According to Cinetopia, AMC is the largest movie theater circuit in the United States. Cinteopia claims that AMC has used its dominant market position to force movie distributors to grant AMC exclusive licenses to play movies, which stifles competition and unfairly harms theaters like Cinteopia. Cinetopia claims that AMC's practices violate federal antitrust laws. Cinetopia also brings state law claims for tortious interference and estoppel. AMC filed a motion to dismiss (doc. 27) all of Cinetopia's claims. For the following reasons, the court denies AMC's motion.

## I.  Factual Background

The following facts are taken from Cinteopia's complaint and are viewed in the light most favorable to Cinetopia.

Cinetopia opened its Prairiefire movie theater ("Cinetopia Overland Park 18") in May 2014. Cinetopia Overland Park 18 is a unique, cutting-edge theater. For example, it operates a restaurant on the premises; offers restaurant and bar menus for some of its screens designed for the exhibition of blockbusters; has ten "Living Room Theaters" with full restaurant and bar service; includes a movie Parlor; and offers other luxury accommodations. When Cinetopia Overland Park 18 opened, AMC was already operating AMC Town Center 20. AMC Town Center 20 does not offer a restaurant menu or in-theater waiter and staff service, and has received a number of negative online reviews.

Cinetopia alleges that in 2010, AMC implemented a National Clearance Position. Under that national policy, AMC told movie distributors (like Disney, Paramount, and Universal) that it wanted exclusive access to movies over any new theater in close proximity to an existing AMC theater. These "clearances" meant that AMC would refuse to play any film a distributor licensed to play for the competing theater. As one example of the execution of AMC's policy, in 2010, AMC sent a letter to the major film distributors indicating that it would "not play day-and-date" with a new movie theater in Georgia that was within three miles of two AMC theaters. Playing day-and-date means to simultaneously exhibit a particular movie. (*See* Doc. 28, at 9; Doc. 29, at 24.) In the same letter, AMC reminded the distributors that AMC had "played 100% of [their] wide commercial releases and look[ed] forward to continuing that arrangement going forward." (Doc. 17, at 17.) And when the new theater opened in Georgia, AMC's CEO told the owner that AMC would use its "full weight and power" to "prevent them from building new theaters near AMC [t]heaters." (*Id.*)

The Cinetopia Overland Park 18 and AMC Town Center 20 are within the same "film licensing zone." A film licensing zone is a geographic area established or recognized by distributors in which prints of films are generally made available to play when released. Cinetopia uses the term "clearance" or "blanket clearance" throughout its complaint to mean an exclusivity agreement between a

-2-

distributor and an exhibitor licensed to play a film (i.e., a distributor like Paramount and an exhibitor like AMC) that applies "to all films licensed in a competitive film licensing zone and is accompanied by a similarly blanket refusal to play day-and-date any film licensed to a competing theater." (*Id*. at 8.)

Before Cinetopia opened its theater at Prairiefire, AMC offered to "buy" the facility. Initially, AMC suggested some "very attractive prices." (*Id.* at 17.) But in the end, AMC's offer was for a purchase price of zero dollars. Cinetopia declined. AMC responded, "Okay, then I guess we will see what happens next summer when you try to open." (*Id.* at 18.) Beginning when Cinetopia opened, AMC's actions resulted in Cinetopia being denied access to a number of desirable movies, including *Godzilla*, *Captain America: Winter Soldier*, *Guardians of the Galaxy*, *Teenage Mutant Ninja Turtles*, *The Amazing Spider-Man 2*, *The Hunger Games: Mockingjay Part 2*, *Divergent Series: The Insurgent*, *Jurassic World*, and *Pitch Perfect 2*, among many others. According to Cinetopia, "AMC's exclusionary demands, backed by AMC's circuit and monopoly power, were the reason distributors denied Cinetopia fair competitive access to high grossing, wide release, commercial films. These denials were not based on the distributors' fair and independent assessment of the quality and customer-drawing capacity of Cinetopia Overland Park, which was vastly superior to that of the competing AMC Theater." (*Id.* at 20.)

After Cinetopia opened, AMC again expressed interest in buying Cinetopia's facilities at attractive prices. But at the same time, AMC was trying to acquire another large national theater circuit, Carmike Cinemas. The size of the Carmike deal required AMC to report the deal to the United States Department of Justice ("DOJ"), who would review the deal for potential anticompetitive effects. Cinetopia claims that AMC renewed its (pretended) interest in buying Cinetopia Overland Park 18 so that Cinetopia would not bring legal action for anticompetitive conduct while the DOJ was reviewing the Carmike deal. According to Cinetopia, AMC delivered an indication of interest including a

-3-

proposed purchase price in February 2016, but advised that the proposed deal would be delayed because of the Carmike acquisition. After the DOJ approved the Carmike acquisition, AMC offered another price—substantially lower than the previous offer. Eventually, AMC offered even worse terms and a condition that Cinetopia release all of its legal claims against AMC.

## II. **Standards of Review**

The court will grant a 12(b)(6) motion to dismiss only when the factual allegations fail to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Although the factual allegations need not be detailed, the claims must set forth entitlement to relief "through more than labels, conclusions and a formulaic recitation of the elements of a cause of action." *In re Motor Fuel Temperature Sales Practices Litig.*, 534 F. Supp. 2d 1214, 1216 (D. Kan. 2008). The allegations must contain facts sufficient to state a claim that is plausible, rather than merely conceivable. *Id*. "All well-pleaded facts, as distinguished from conclusory allegations, must be taken as true." *Swanson v. Bixler*, 750 F.2d 810, 813 (10th Cir. 1984); *see also Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The court construes any reasonable inferences from these facts in favor of the plaintiff. *Tal v. Hogan*, 453 F.3d 1244, 1252 (10th Cir. 2006).

Discovery in antitrust cases can be expensive. *Twombly*, 550 U.S. at 558 (applying the plausibility standard to Sherman Act antitrust claims). But while this potential expense may require some specificity in pleading, antitrust cases do not require heightened fact pleading. *Id.* at 570. Rather, an antitrust complaint is subject to the same standards identified above. *Id.*; *see also In re Urethane Antitrust Litig.*, 663 F. Supp. 2d 1067, 1074 (D. Kan. 2009).

**III.   Analysis**

   **A.   Count I – Circuit Dealing**

The court first addresses Cinetopia's claim for circuit dealing.  Defendant argues that this claim fails because it is not a per se violation of the antitrust laws (so plaintiff must plead a relevant market, but hasn't done so) and, even if it is a per se violation, plaintiff has not provided adequate allegations to state a claim under either *United States v. Griffith*, 334 U.S. 100 (1948), *overruled on other grounds by Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 771–72 (1984), or *United States v. Paramount Pictures, Inc.*, 334 U.S. 131 (1948).

*Griffith* and *Paramount* identify two forms of circuit dealing.  The first involves the use of circuit buying power and is described in *Griffith* as follows:

> A man with a monopoly of theatres in any one town commands the entrance for all films into that area. If he uses that strategic position to acquire exclusive privileges in a city where he has competitors, he is employing his monopoly power as a trade weapon against his competitors. It may be a feeble, ineffective weapon where he has only one closed or monopoly town. But as those towns increase in number throughout a region, his monopoly power in them may be used with crushing effect on competitors in other places.

334 U.S. at 107.  The second type of circuit dealing, identified in *Paramount*, is the elimination, by contracts or otherwise, of competitive bidding on a film-by-film and theater-by-theater basis. 334 U.S. at 154–55.

Cinetopia alleges that AMC has engaged in both types of circuit dealing, and that such actions are per se unlawful.  Specifically, Cinetopia alleges that AMC has monopoly power in many markets where AMC is the only theater operating.  AMC is therefore able to use its position of power in those markets to receive beneficial treatment in markets where it is not the only

-5-

theater. And Cinetopia further alleges that AMC has negotiated "blanket clearances" for movie licenses, which eliminates competition on a film-by-film basis.

### *1. Per Se Violation*

AMC asks the court to determine that the type of circuit dealing alleged by Cinetopia is a vertical restraint of trade, which is analyzed under the "rule of reason" instead of the per se rule. *See Ohio v. Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (explaining that vertical restraints are "restraints 'imposed by agreement between firms at different levels of distribution'") (citation omitted). It is typically only horizontal restraints, which are created by agreement between competitors, that qualify for per se treatment. *Id.* AMC argues that the Tenth Circuit has said that the per se rule should be limited in application. *See*, *e.g., Buccaneer Energy (USA) Inc. v. Gunnison Energy Corp.*, 846 F.3d 1297, 1306 (10th Cir. 2017) ("The rule of reason is the default approach, and there is a presumption in favor of its application."). And the Supreme Court has in recent years addressed a number of once-unlawful vertical restraints and evaluated them under the rule of reason. *See*, *e.g., Cont'l T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 59 (1977) (reversing prior precedent that vertical non-price restraints were per se unlawful); *State Oil v. Kahn*, 522 U.S. 3, 22 (1997) (holding that vertical maximum retail price maintenance agreements were not per se unlawful; reversing prior precedent); *Leegin Creative Leather Prods., Inc. v. PSKS, Inc.*, 551 U.S. 877, 899–908 (2007) (same, with vertical minimum retail price maintenance agreements). Finally, AMC asks this court to consider *Paramount* and *Griffith* in their context—a time when the relationships between movie distributors and exhibitors were not the same as they are today. *See Redwood Theaters, Inc. v. Festival Enters., Inc.*, 200 Cal. App. 3d 687, 697 (1988).

The Supreme Court has not overturned the per se treatment of circuit dealing claims. And lower courts continue to apply the per se rule with respect to circuit dealing claims. *See*, *e.g., 2301 M*

*Cinema LLC v. Silver Cinemas Acquisition Co.*, No. 17-1990 (EGS), 2018 WL 4681007, at *3 (D.C. Cir. Sept. 28, 2018); *Cobb Theaters III, LLC v. AMC Entm't Holdings, Inc.*, 101 F. Supp. 3d 1319, 1343 (N.D. Ga. 2015); *Reading Int'l, Inc. v. Oaktree Cap. Mgmt. LLC*, No. 03-CV-1895, 2007 WL 39301, at *7 (S.D.N.Y. Jan. 8, 2007); *Flagship Theaters of Palm Desert, LLC v. Century Theaters, Inc.*, 131 Cal. Rptr. 3d 519, 527 (Cal. Ct. App. 2011). This court will do the same. In any event, for the reasons stated later in this opinion, the result would not change if the court were to apply the rule of reason.

### 2. *Adequate Allegations*

AMC further argues that even if circuit dealing is treated as a per se antitrust violation, Cinetopia has failed to adequately allege a claim under either *Griffith* or *Paramount*. Specifically, AMC claims that Cinetopia does not adequately allege any external markets for purposes of a leveraging claim under *Griffith*. And AMC also claims that Cinetopia merely makes conclusory statements about "blanket clearances" and film-by-film licensing that fail to adequately support a claim under *Paramount*.

#### a) Allegations of External Markets

*Griffith* prohibits circuit dealing in the form of monopoly leveraging. This happens when an exhibitor "with a monopoly of theaters in any one town . . . uses that strategic position to acquire exclusive privileges in a city where [the exhibitor] has competitors." *Griffith*, 334 U.S. at 107. To state a claim for this type of antitrust violation, the plaintiff must allege a second market that is being leveraged. *See Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1222 (10th Cir. 2009).

AMC complains that Cinetopia did not identify a specific non-competitive market in which AMC owns a theater. But Cinetopia alleges a nationwide circuit—the largest in the United States.

-7-

And Cinetopia alleges that AMC is the sole film provider in many markets. It further alleges that the majority of AMC's theaters lack a direct competitor within three miles. As in *Cobb Theaters III*, this is a sufficient allegation of the use of an entire circuit, including theaters in closed markets, to obtain privileges in competitive markets. 101 F. Supp. 3d at 1343. The test here is plausibility; not certainty. Cinetopia's allegations of an external market are sufficient to satisfy *Twombly*.

### b) Conclusory Statements of "Blanket Clearances"

*Paramount* says that a movie exhibitor may not pool its purchasing power by negotiating "agreements that cover two or more theaters in a particular circuit . . . ." 334 U.S. at 154. This conduct "eliminate[s] the opportunity for a small competitor to obtain the choice of first runs," and "put[s] a premium on the size of the circuit." *Id.* According to AMC, Cinetopia must allege facts sufficient to show "(i) a licensing agreement for a film covering multiple AMC theaters, that (ii) had the effect of eliminating the opportunity for Cinetopia to obtain a license agreement at Cinetopia Overland Park 18." (Doc. 28, at 28.)

Cinetopia alleges that blanket clearances were a core part of AMC's "national exclusionary campaign to prevent or limit competitive entry." (Doc. 17, at 15.) Cinetopia further alleges that AMC discussed its policy with each major distributor and "insisted on blanket clearances and refusals to play day-and-date to protect any theater in its national circuit from 'competitive encroachment.'" (*Id.* at 16.) According to Cinetopia, AMC's practices "destroyed competition on a film-by-film theater-by-theater basis." (Doc. 29, at 23.) Cinetopia claims that "AMC's exclusionary demands, backed by AMC's circuit and monopoly power, were the reason distributors denied Cinetopia fair competitive access to high grossing, wide release, commercial films. These denials were not based on the distributors' fair and independent assessment of the quality and customer-drawing capacity of Cinetopia Overland Park, which was vastly superior to that of the competing AMC Theater." (Doc.

17, at 20.)  These allegations are adequate to plausibly state a claim under *Paramount*.  To be certain, Cinetopia will have to offer more specific evidence of agreements covering multiple theaters to survive a motion for summary judgment.  But the allegations in Cinetopia's complaint are sufficient for this stage of the proceedings.

### B.     Counts II – IV

In Count II of its complaint, Cinetopia alleges a claim for monopolization under § 2 of the Sherman Act.  Count III is for attempted monopolization under the same law.  And Count IV is for unreasonable restraint of trade in violation of § 1 of the Sherman Act.  AMC argues that all three claims fail for the same overriding reason: Cinetopia has not alleged a relevant market.

Section 2 of the Sherman Act establishes that it is illegal to "monopolize, or attempt to monopolize . . . any part of the trade or commerce among the several States . . . ."  15 U.S.C. § 2.  Section 2 prohibits monopolistic anticompetitive conduct that harms competition.  *Auraria Student Hous. at the Regency, LLC v Campus Vill. Apartments, LLC*, 843 F.3d 1225, 1233 (10th Cir. 2016).  "The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market.  The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself."  *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 458 (1993).  The elements of a § 2 claim are "(1) monopoly power in the relevant market; (2) willful acquisition or maintenance of this power through exclusionary conduct; and (3) harm to competition."  *Lenox MacLaren Surg. Corp. v. Medtronic, Inc.*, 847 F.3d 1221, 1231 (10th Cir. 2017).  To prove a § 2 monopolization and attempt claim, plaintiffs must show that "a defendant's conduct actually monopolizes or dangerously threatens to do so."  *Id.* (quoting *Spectrum Sports*, 506 U.S. at 459).  Additionally, all § 2 claims require proof of a relevant antitrust market.  *Buccaneer*, 846 F.3d at 1320 (citing *Auraria*, 843 F.3d at 1232–33).

Section 1 of the Sherman Act prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations." 15 U.S.C. § 1. For a § 1 violation, a plaintiff must plead (1) a contract, combination, or conspiracy among two or more independent actors; (2) that unreasonably restrains trade; and (3) is in, or substantially affects, interstate commerce. *Id.*; *TV Commc'ns Network, Inc. v. Turner Network Television, Inc.*, 964 F.2d 1022, 1027 (10th Cir. 1992). To show that a restraint of trade under § 1 violates the rule of reason, a plaintiff must also identify a relevant market. *Ohio*, 138 S. Ct. at 2284.

### *1. Allegations of Relevant Market*

"'Because the relevant market provides the framework against which economic power can be measured, defining the product and geographic markets is a threshold requirement.'" *Auraria*, 843 F.3d at 1244 (quoting *Campfield v. State Farm Mut. Auto. Ins. Co.*, 532 F.3d 1111, 1118 (10th Cir. 2008)). The product market "is composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use and qualities considered." *Id.* at 1244–45 (quoting *SCFC ILC, Inc. v. Visa USA, Inc.*, 36 F.3d 958, 966 (10th Cir. 1994)). "The geographic market is the narrowest market which is wide enough so that products from adjacent areas cannot compete on a substantial parity with those included in the market." *Id.* at 1945 (quoting *Westman Comm'n Co. v. Hobart Int'l, Inc.*, 796 F.2d 1216, 1222 (10th Cir. 1986)). "Failure to allege a legally sufficient market is cause for dismissal of the claim." *Campfield*, 532 F.3d at 1118. But market definition is also a "deeply fact-intensive inquiry," making courts hesitant to dismiss for failure to plead a relevant market. *Concord Assocs., L.P. v. Entm't Props. Trust*, 817 F.3d 46, 53 (2d Cir. 2016); *Reazin v. Blue Cross & Blue Shield, Inc.*, 899 F.2d 951, 975 (10th Cir. 1990). Market definitions are sufficient if they "plausibly suggest the contours of the relevant geographic and product markets." *Cobb Theaters III*, 101 F. Supp. 3d at 1336 (citation and quotation marks omitted).

### a) Are allegations of a relevant market required?

Cinetopia argues that it is not required to define a relevant market for Counts II–IV for two reasons. First, Cinetopia claims that it has offered direct evidence of monopoly power, which relieves it of the need to define a market. Second, Cinetopia claims that a market definition is not required because it has alleged the factual predicate for a "quick look" analysis. The court need not address either of these arguments further here because, as explained below, the court determines that Cinetopia has sufficiently alleged a relevant market.

### b) Geographic Market

Cinetopia alleges that the geographic market is "local because existing industry structure limits access to competitive film licensing zones." (Doc. 17, at 10.) In this case, the geographic market is therefore the "Overland Park/Leawood film licensing zone in which Cinetopia Overland Park 18 and AMC Town Center 20 in Leawood are located . . . ." (*Id.*)

AMC argues that Cinetopia's geographic market definition is too limited. According to AMC, a valid geographic market definition must "reflect[] the total market demand for plaintiffs' product" and "cannot circumscribe the market to a few buyers." *Campfield*, 532 F.3d at 1118–19.

The court determines that Cinetopia's alleged geographic market is sufficient because Cinetopia is alleging that AMC is a monopsonist—a buyer who is able to assert market power in the upstream input market. *See id.* at 1118. "When considering market power in a monopsony situation, 'the market is not the market of competing sellers [here, the movie theaters exhibiting the films] but of competing buyers. This market is comprised of buyers who are seen by sellers as being reasonably good substitutes.'" *Id.* (citation omitted). In a monopsonist case, the court looks upstream at how the distributors determine "reasonably good substitutes."

-11-

Cinetopia has alleged that AMC essentially forced the upstream movie distributors to create "film licensing zones" to determine who will receive licenses within geographic areas. There may be other theaters within relatively close proximity to AMC and Cinetopia. And ultimately, the facts may show that a different geographic market is proper. But for now, Cinetopia has plausibly alleged that a proper geographic market is that which was created by AMC's own actions.

                c)        Product Market

Cinetopia alleges that the relevant product market is the "market for licensing of first run, high grossing, wide release, commercial films," or the "film licensing market." (Doc. 17, at 9.) AMC argues that this does not make sense; the product at issue is not the license—it's the films themselves.

On this point, the court agrees with Cinetopia. As noted above, Cinetopia has essentially alleged a monopsony. The relevant market is therefore the upstream purchases (of licenses) instead of the downstream sales (of tickets to view the movies). Practically speaking, it is not the movies themselves that are being bought and sold here. It is the right—or the license—to exhibit the movies and view the movies. Cinetopia has adequately alleged a relevant product market.

    **C.**    **State Law Claims**

Finally, Cinetopia brings two state law claims: one for tortious interference, and one for estoppel. AMC asks the court to dismiss both claims.

        *1.*    *Tortious Interference with Actual and/or Prospective Business Relations*

To state a claim for tortious interference with a business relationship, Cinemark must allege:

> (1) the existence of a business relationship or expectancy with the probability of future economic benefit to the plaintiff; (2) knowledge of the relationship or expectancy by the defendant; (3) that, except for the conduct of the defendant, plaintiff was reasonably certain to have continued the relationship or realized the expectancy; (4) intentional misconduct by defendant; and (5) damages suffered by plaintiff as a direct or proximate cause of defendant's misconduct.

*Ayres v. AG Processing Inc.*, 345 F. Supp. 2d 1200, 1210 (D. Kan. 2004). AMC asserts that it has a privilege to "interfere." *Digital Ally, Inc. v. Utility Assocs., Inc.*, No. 14-2262-CM, 2017 WL 1197561, at *17 (D. Kan. Mar. 30, 2017). This privilege is grounded in the Restatement (Second) Torts, which provides that competitors do not tortuously interfere when

> (a) the relation concerns a matter involved in the competition between the actor and the other and
> (b) the actor does not employ wrongful means and
> (c) his action does not create or continue an unlawful restraint of trade and
> (d) his purpose is at least in part to advance his interest in competing with the other.

Restatement (Second) Torts § 768. The Tenth Circuit has predicted that Kansas courts would adopt this principle. *DP-Tek Inc. v. AT&T Glob. Info. Sols. Co.*, 100 F.3d 828, 831 (10th Cir. 1996). AMC argues that under Kansas law, "wrongful means" requires Cinetopia to plead independently actionable conduct. Because Cinetopia's antitrust claims fail, AMC argues, its tortious interference claims must fail, as well. But this court has held that Cinetopia's antitrust claims may proceed. Because Cinetopia has plausibly alleged that AMC has employed wrongful means to obtain movie licenses, AMC cannot succeed on its competitive privilege defense at this time.

Alternatively, AMC asks the court to dismiss Cinetopia's tortious interference claim because Cinetopia has not adequately identified the specific groups of individuals with which it had a business expectancy. But Cinetopia has alleged that AMC interfered with Cinetopia's relationship with the Prairiefire development by "reducing [the development's] attendance and revenues, and limiting its growth and viability." (Doc. 17, at 3.) Cinteopia has also alleged that AMC interfered with its "relationships with distributors that include future economic benefits to Cinetopia from the continued fair competitive access to the licensing of movies." (*Id.* at 28.) Cinetopia specifically identifies these distributors as Disney, Paramount, Sony, Universal, Warner Bros., Lionsgate, and Universal. And Cinetopia has alleged that AMC interfered with its theater patrons. It is unnecessary to identify

-13-

individual ticket purchasers when setting forth allegations in the complaint. *See In re Syngenta AG MIR 162 Corn Litig.*, 131 F. Supp. 3d 1177, 1218 (D. Kan. 2015). These allegations are sufficient to state a claim for tortious interference.

### 2. *Estoppel*

To succeed on a claim of promissory estoppel, a party must show: "(1) the promisor reasonably intended or expected the promisee to act in reliance on the promise; (2) the promisee acted reasonably in reliance on that promise; and (3) a refusal of the court to enforce the promise would sanction the perpetration of fraud or result in other injustice." *W & W Steel, LLC v. BSC Steel, Inc.*, 944 F. Supp. 2d 1066, 1078 (D. Kan. 2013) (citing *Ayalla v. Southridge Presbyterian Church*, 152 P.3d 670, 677 (Kan. Ct. App. 2007)). Estoppel does not apply if "any essential element thereof is lacking or is not satisfactorily proved." *Ram Co. v. Estate of Kobbeman*, 696 P.2d 936, 944 (Kan. 1985) (citation omitted). And "[e]stoppel will not be deemed to arise from facts which are ambiguous and subject to more than one construction." *Gillespie v. Seymour*, 823 P.2d 782, 789 (Kan. 1991) (citation omitted).

AMC asks the court to dismiss Cinetopia's estoppel claim because the only promise it identifies is not enforceable as a matter of law. According to AMC, Cinetopia claims "AMC promised to purchase Cinetopia Overland Park 18 for fair consideration," (doc. 17, at 29), which is merely a general proposal (without an offer and acceptance), and is not enough. It was a mere agreement to agree.

AMC does not identify all of Cinetopia's allegations relating to its claim for estoppel. In addition to the allegation identified above, Cinetopia also alleged that AMC promised to buy the theater for a specific price: "In February 2016, AMC delivered an indication of interest including a proposed purchase price, but AMC advised Cinetopia that the proposed deal would be delayed due to the DOJ's investigation of the AMC-Carmike deal." (Doc. 17, at 23.) And Cinetopia claims, "In order

-14-

to forestall legal action by Cinetopia to block AMC's unlawful clearances and to prevent the DOJ from learning about this exclusionary conduct, AMC once again pretended to be interested in buying Cinetopia's facilities at attractive prices." (*Id.*) Finally, "AMC repeatedly assured Cinetopia in numerous private communications that it would buy Cinetopia's theaters at the original valuation, after the Carmike deal was finalized." (*Id.*) Cinetopia alleges that it relied on these assurances to its detriment. At this stage of the proceedings, these allegations are sufficient to plausibly state a claim for estoppel.

## IV. Conclusion

For the above reasons, the court denies AMC's motion to dismiss. While the evidence ultimately may not support all of Cinetopia's claims, Cinetopia has pleaded plausible causes of action for violations of federal antitrust law and state law at this time.

**IT IS THEREFORE ORDERED** that Defendants' Motion to Dismiss (Doc. 27) is denied.

Dated this 27th day of December, 2018, at Kansas City, Kansas.

**s/ Carlos Murguia**
**CARLOS MURGUIA**
**United States District Judge**